THE NATIONAL ASBESTOS WORK-ERS MEDICAL FUND, et al.,
Plaintiffs,

v.

**PHILIP MORRIS, INC.,**
**et al., Defendants.**

**Blue Cross and Blue Shield of New**
**Jersey, Inc., et al., Plaintiffs,**

v.

Philip Morris, Incorporated,
et al., Defendants.

Nos. 98 CV 1492, 98 CV 3287.

United States District Court,
E.D. New York.

Sept. 7, 1999.

Law Offices of Peter G. Angelos, P.C. by E. David Hoskins, David L. Palmer, Kenneth D. Pack, Baltimore, MD, O'Donoghue & O'Donoghue by Sally M. Tedrow, Louis P. Malone, Washington, D.C., for Plaintiffs the National Asbestos Workers Medical Fund, et al.

Dewey Ballantine LLP, by Paul J. Bschorr, Vincent R. Fitzpatrick, Jr., Michael C. Hefter, Heather K. McDevitt, Robert J. Morrow, New York, NY, for Plaintiffs Blue Cross & Blue Shield of N.J., Inc., et al.

Wachtell, Lipton, Rosen & Katz by Herbert M. Wachtell, Steven M. Barna, Michael A. Charish, Peter C. Hein, New York, NY, Winston & Strawn, by Jeffrey M. Wagner, Chicago, IL, for Defendant Philip Morris, Incorporated.

Kirkland & Ellis by Marjorie Press Lindblom, New York, NY, Sedgwick, Detert, Moran & Arnold by David M. Covey, New York, NY, for Defendant Brown & Williamson Tobacco Corporation.

Greenberg Traurig, LLP by Alan Mansfield, New York, NY, Shook, Hardy & Bacon, L.L.P., by Gary R. Long, Kansas City, MO, for Defendants Lorillard Tobacco Company, Lorillard, Inc., and Loews Corp.

Debevoise & Plimpton by Harry Zirlin, Anne E. Cohen, New York, NY, for Defendant Council for Tobacco Research, U.S.A., Inc.

Jacob, Medinger & Finnegan, LLP by David R. Crittenden, New York, NY, for Defendant Smokeless Tobacco Council, Inc.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin by Peter J. Busch, San Francisco, CA, Riker, Danzig, Scherer, Hyland & Perretti, LLP, by Alan E. Kraus, Morristown, NJ, for Defendants R.J. Reynolds Tobacco Co., and RJR Nabisco, Inc.

Simpson Thacher & Bartlett, by Joseph M. McLaughlin, Michael P. Panagrossi, New York, NY, for Defendant British American Tobacco (investments) limited (formerly known as British–American Tobacco Company Limited).

Davis & Gilbert, LLP, by Bruce M. Ginsberg, Marc J. Rachman, New York, NY, for Defendant Hill & Knowlton, Inc.

*MEMORANDUM AND ORDER* '

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I.  INTRODUCTION ...............................................223

II.  FACTS ...................................................................223
    A.  Plaintiffs' Original Claims...........................................223
    B.  Procedural Background ............................................224
    C.  Amendments To Plaintiffs' Original Complaints .......................224

III.  ANALYSIS OF CLAIMS ..................................................224
    A.  "Direct" RICO ...................................................224
        1.  Proximate Causation Generally ................................225
        2.  *Laborers Local* ...........................................225
        3.  Application Of Law To Blue Cross And National Asbestos ...............226
    B.  Subrogation......................................................228
        1.  RICO Claims ...............................................228
        2.  Pecuniary Losses Associated With Personal Injuries ..................229
            a.  Statutory Language .......................................229
            b.  Legislative Purpose .......................................230
            c.  Case Law ...............................................231
            d.  RICO Limitations In Other Circuits ...........................234
            e.  *Laborers Local 17* ......................................237
    C.  Aggregation Of Claims ............................................238
    D.  State Claims .....................................................239

IV.  CONCLUSION ........................................................240

## I.  INTRODUCTION

Defendants moved to dismiss the complaints in these two cases on the theory that a decision in *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* ("Laborers Local 17"), 191 F.3d 229 (2d Cir.1999), *superseding* 172 F.3d 223 (2d Cir.1999), blocks the plaintiffs' federal causes of action and requires dismissal of all state law claims. The motions were denied. *See* Preliminary Memorandum And Order, August 2, 1999. This memorandum and order explains that decision.

*Laborers Local 17* held that the plaintiffs' injuries in that case were too remote—i.e., were not proximately caused—to support a cause of action under RICO. As observed in an opinion issued prior to *Laborers Local 17,* and as *Laborers Local 17* itself recognized, the legal concept of proximate causation is a normative, flexible, and highly fact specific doctrine which requires individualized inquiry in each case. *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 36 F.Supp.2d 560, 579 (E.D.N.Y.1999) ("This determination [of proximate cause] is primarily one of policy, requiring a highly flexible and case specific approach."); *see also Laborers Local 17,* 191 F.3d at 235 ("Proximate cause is an elusive concept, one 'always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent.'" (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 42, at 279 (5th ed.1984) (quoting 1 Street, *Foundations of Legal Liability* 110 (1906)))).

There are differences between the parties and circumstances in the present cases and those in *Laborers Local 17* relevant to the proximate cause inquiry and providing grounds to distinguish the two litigations. *Laborers Local 17* does not preclude the instant cases' complaints. Even if the plaintiffs' federal causes of action, as originally stated, are ultimately found to be barred by *Laborers Local 17,* neither of the present actions can be dismissed at the pleading stage. The plaintiffs in both cases have amended their complaints to state valid, alternative theories of liability.

## II.  FACTS

### A.  Plaintiffs' Original Claims

Both cases involve claims by medical providers to be compensated for the economic injuries they have allegedly sustained as a result of the treatment of tobacco related illnesses. In both cases

the defendants are the major tobacco manufacturers and related entities.

In Blue Cross & Blue Shield of New Jersey, Inc., et al. v. Philip Morris, Inc., et al. ("Blue Cross"), the plaintiffs are medical provider plans ("The Blues") claiming violations of both federal and state law. The federal causes of action are brought under the Racketeer Influenced and Corrupt Organizations Act (RICO) and antitrust statutes. The pendent state law claims are asserted under various state statutes and under common law theories such as fraudulent misrepresentation, fraudulent concealment, breach of special duty, unjust enrichment, and conspiracy.

In The National Asbestos Workers Medical Fund, et al. v. Philip Morris, Inc., et al. ("National Asbestos"), the plaintiffs are self-insured ERISA trust funds which provide health care benefits to union workers in the building trades. The plaintiffs state claims under federal RICO and under federal common law on theories of unjust enrichment, restitution, indemnity, and breach of assumed duty. *See Blue Cross*, 36 F.Supp.2d 560 (E.D.N.Y.1999) (setting out original allegations in detail); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 23 F.Supp.2d 321 (E.D.N.Y.1998).

### B.  Procedural Background

On October 19, 1998, defendants' Rule 12(b)(6) motion in National Asbestos was denied. *See National Asbestos*, 23 F.Supp.2d at 323. Given the expansive public policies of RICO, the comprehensive preemptive force of ERISA, and the conflicting decisions regarding the sufficiency of similar claims, a dismissal based on the pleadings was inappropriate.

On March 30, 1999, the defendants' motion to dismiss in Blue Cross was denied. *See Blue Cross*, 36 F.Supp.2d at 564. The RICO allegations contained in the Blues' complaint were sufficiently consonant with Supreme Court precedent, modern tort law's conception of proximate causation, and the statutory design and policy of RICO to withstand a motion directed at the complaint.

Ten days after the *Blue Cross* opinion was issued and approximately six months after the *National Asbestos* opinion, the court of appeals of the Second Circuit decided an interlocutory appeal in a case involving RICO allegations against the tobacco industry by union trust fund-insurers. *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 172 F.3d 223 (2d Cir.1999), *withdrawn and superseded by* 191 F.3d 229 (2d Cir.1999). The court in *Laborers Local 17* found the claims of plaintiff trust funds to be compensated for tobacco related expenditures to be too "indirect." *See id.*, 191 F.3d at 238–40. The defendants then renewed their motions to dismiss the complaints in both Blue Cross and National Asbestos on the grounds that both suits are controlled by *Laborers Local 17*.

### C.  Amendments To Plaintiffs' Original Complaints

In June 1999 plaintiffs in both Blue Cross and National Asbestos moved to amend their complaints to add new claims and to restate, in the alternative, the original federal and state claims under subrogation; they continued to press all their original claims. They were permitted to amend their complaints pursuant to the liberal standards of Rule 15 of the Federal Rules of Civil Procedure. Decision was reserved on whether the amended complaints stated valid causes of action.

### III.  ANALYSIS OF CLAIMS

### A.  "Direct" RICO

Defendants contend that *Laborers Local 17* bars plaintiffs' original RICO claims. In contrast, plaintiffs argue that there are important factual and pleading distinctions between *Laborers Local 17* and Blue Cross and National Asbestos which distinguish the cases.

### 1. Proximate Causation Generally

■ The legal concept of proximate causation mandates a multi-faceted and highly fact specific inquiry. Proximate cause analysis is driven by considerations of policy, fairness, and practicability, rather than by a rigid adherence to classifications or abstractions. The Supreme Court has pointed out that the proximate causation decision should be guided by a flexible, case-by-case approach. In *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 536–37, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Court stated:

> [T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances.

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Court reiterated the impropriety of black letter rules in a proximate cause context, adding, "our use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out [in the opinion]." *Id.* at 272 n. 20, 112 S.Ct. 1311.

The formulation of rigid, simple rules for proximate cause is often inappropriate. The classification of claims and injuries into a *priori* categories such as "derivative" or "direct" is at times an exercise in obscuration. *See, e.g., Blue Cross*, 36 F.Supp.2d at 582 ("Courts' treatment of loss of consortia claims demonstrate how the decision to label an injury 'derivative' is itself a subjective and policy-based analysis."); *see also Laborers Local 17*, 191 F.3d at 239 n. 4 ("[T]he term 'indirect' may connote concepts—such as remoteness in time or space—other than 'derivative,'

which itself cannot be defined with absolute precision.").

New problems of proximate causation require a normative inquiry based at least in part upon notions of social justice. As a leading treatise on tort law sums up the matter:

> "Proximate cause" ... is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct.... Some boundaries must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.
>
> This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands, or of what is administratively possible and convenient.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed.1984); *see also Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 (quoting *Prosser & Keeton* ).

Analysis of proximate causation must remain flexible, rather than static: as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures.

### 2. *Laborers Local 17*

In *Laborers Local 17*, the court concluded that the RICO claims of the union trust funds were "too remote" as a matter of law. The court acknowledged that a black letter rule precluding all claims capable of being characterized as "derivative" or "indirect" would be inconsistent with the modern notion of proximate cause and Supreme Court case law. "[W]here a plaintiff complains of injuries that are wholly derivative of harm to a third party," the court stated, "plaintiff's injuries are *gener-*

*ally deemed* indirect and as a consequence too remote, as a matter of law, to support recovery." *Laborers Local 17*, 191 F.3d at 236–37 (emphasis added). "At the same time," the court continued, "the Supreme Court noted the impossibility of articulating a black-letter rule capable of dictating a result in every case." *Id.* (citing *Holmes*, 503 U.S. at 272 n. 20, 112 S.Ct. 1311).

The court of appeals proceeded to analyze the plaintiffs' claims in the context of the three policy concerns outlined in *Holmes* and discussed in the district court's *Blue Cross* memorandum. *See Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311; *Blue Cross*, 36 F.Supp.2d at 574–77. The court in *Laborers Local 17* reiterated that the sufficiency of the plaintiffs' legal claims must be tested by reference to the general policy considerations set out in *Holmes* rather than by a facile characterization. It declared:

> Accordingly, we follow the lead of the *Holmes* Court in making clear that, to the extent our description of "indirect" or "derivative" injury might seem to encompass cases where recovery by the plaintiff would not run afoul of the policy concerns set forth above, the outer limits of the direct injury test are described more by those concerns than by any bright-line, verbal definition.

*Laborers Local 17*, 191 F.3d at 239 n.4.

*Laborers Local 17* rejected the plaintiffs' complaint only after it had concluded that the claims presented substantial difficulties with respect to the ascertainment and apportionment of damages and after it had decided that the rejection of plaintiffs' claims would not undermine the policies incorporated in the RICO statute. *See Laborers Local 17*, 191 F.3d at 238–42.

### 3. Application Of Law To Blue Cross And National Asbestos

In *Blue Cross*, 36 F.Supp.2d 560 (E.D.N.Y.1999), the district court concluded that the plaintiff health plan providers had standing to press their RICO claims by virtue of the application of the three policy considerations articulated in *Holmes* and in light of the common law's acceptance of analogous claims under proximate cause and tort analysis. Here, the statutory design and common law conceptions of proximate cause do not appreciably diverge. *See Moore v. PaineWebber*, 189 F.3d 165, 179–80 (2d Cir.1999) (Calabresi, J., concurring) ("Where the defendant's behavior is made actionable by a statute, it must of course be the statute that defines the extent of his liability.").

■ Even were a court to accept defendants' proposition that a large part of the reasoning in *Blue Cross* was rejected by *Laborers Local 17*, it does not follow that dismissal is required of the individual claims of the plaintiffs in the current separate Blue Cross cases. As pointed out in some detail in *Blue Cross*, there are a number of unique features of the Blue Cross plaintiffs and their injuries which are relevant to the proximate cause analysis. Some of these special characteristics were not present in *Laborers Local 17*. A court should hesitate before stretching precedent too broadly with respect to the flexible and highly fact specific analysis of proximate causation, particularly when a new case presents complicated and distinguishing aspects. *See, e.g., People v. Olah*, 300 N.Y. 96, 101, 89 N.E.2d 329, 332 (1949) (Fuld, J.)("No opinion is an authority beyond the point actually decided, and no judge can write freely if every sentence is to be taken as a rule of law separate from its association." (citation and quotation marks omitted)).

■ The Blues are not simply traditional insurers which passively receive premiums for the purpose of allocating risk. Rather, they play a far more active and direct role in the provision of health care to the general public than do traditional insurers, including the plaintiffs in *Laborers Local 17*. As observed in *Blue Cross*:

> Today subscribers often rely on organizations such as the Blues not only to

allocate risk, but also to help establish and administer networks of hospitals and physicians to make health care more affordable. The Blues are the largest provider of such managed care programs in the country. Some 45 million individuals are enrolled in some type of managed care administered by the Blues. Through these managed care programs plaintiffs take an active and leading role in shaping the delivery of health care in this country. Directly and indirectly, medical insurers-providers such as the Blues decide what medical procedures will be offered, to whom they will be offered and when and how they will be offered.

36 F.Supp.2d at 586.

The active role of the Blues in providing medical care to the nation's population is relevant for a number of reasons. First, injuries to the Blues are analogous to other "derivative" injuries, such as loss of consortia, which the law generally favors as compensable. As pointed out in *Blue Cross*:

> Recognizing a direct cause of action on the part of the Blues is consistent with the role plaintiffs play in today's society. In the same way that a spouse or parent has an obligation to provide for the medical injuries of his spouse or child, nonprofit medical providers such as the Blues have an obligation to supply medical care to their covered populations. More and more, medical providers such as the Blues have assumed the responsibility for ensuring that individuals have access to medical care. For the nearly 70 million people, one out of every four Americans, who rely on the Blues to provide their medical care, plaintiffs occupy a type of *parens patriae* relationship with their insureds which is analogous to the parent-child relationship.

36 F.Supp.2d at 581. Injury to the Blues was allegedly more foreseeable, and allegedly more calculated as part of the defendants' racketeering scheme, because of the Blues' dominant and highly visible role as health care providers throughout the nation.

These unique aspects of the Blues and their injuries are relevant to at least two of the three policy considerations set out in *Holmes*. The court in *Laborers Local 17* reasoned that the apportionment of damages would be complicated by the existence of multiple layers of health care insurers. *See* 191 F.3d at 240–41. With respect to at least some of the Blues plaintiffs, the apportionment of damages may be substantially simplified where the Blues provide health care directly to the covered population. The Blues' dominant and central role as providers of health care coverage might also simplify the apportionment of damages.

Organizations with the incentives and resources of the Blues are uniquely suited to vindicate the economic injuries sustained by the nations' health care infrastructure, allegedly as a result of the defendants' racketeering. The court in *Laborers Local 17* observed that the plaintiffs in that action could initiate a subrogated claim to recover their economic losses. *See* 191 F.3d at 241. Unless the subrogated claims are brought under RICO, however, those claims will not serve to fully vindicate the overriding policy of the RICO statute in deterring racketeering.

The unique features of the Blues and their injuries support their original RICO claims in light of *Laborers Local 17*. It is difficult to conclude that the court of appeals intended its proximate cause analysis to apply to the precise set of facts presented in Blue Cross. Despite the fact that the memoranda in *Blue Cross* and *National Asbestos* were issued prior to the court of appeals' decision in *Laborers Local 17*, and even though, according to the defendants, the decisions were brought to the panel's attention before it issued its decision, the facts of *Blue Cross* and *National Asbestos* were neither mentioned nor alluded to in *Laborers Local 17*.

While there appears to be sufficient legal bases for allowing the Blues' original RICO claims to proceed, that issue need not be definitively decided now. The Blues have amended their complaint to state a valid, alternative basis for recovery under RICO. As a result, there is little to be gained by the dismissal of their original RICO claim at this time. The discovery required by the different claims is virtually identical. Striking of portions of either complaint would not appreciably save time or expense. It would not refine the issues for trial in any meaningful way.

In the case of *National Asbestos*, there are few features distinguishing it from *Laborers Local 17*. Thus, dismissal of the plaintiffs' original stated RICO claims might arguably be warranted. Because these plaintiffs have also amended their complaint to state valid causes of action under an alternate theory, however, the defendants' motion to dismiss these "direct" RICO claims is denied, with leave to renew in the event that further developments during discovery demonstrate the desirability of pre-trial dismissal.

### B. Subrogation

The plaintiffs in *Blue Cross* and *National Asbestos* have amended their complaints to add RICO causes of action under a theory of subrogation. These claims are consistent with the policies, legislative history, and statutory language of RICO as well as Supreme Court case law interpreting the statute. The plaintiffs in both cases will be allowed to pursue this litigation under this theory.

#### 1. RICO Claims

■ The equitable doctrine of subrogation allows insurers, analogous in some respects to the plaintiffs, to bring their own claims for the recovery of the economic damages incurred as a result of tortious injury to their insureds.

■ Subrogation functions as a form of assignment. RICO claims are assignable. *See, e.g., Koehler v. NationsBank Corp.,*

1997 WL 112836, at *2 (N.D.Ill. March 10, 1997) ("[F]ederal courts have consistently held that RICO claims are assignable."); *Resolution Trust Corp. v. S & K Chevrolet,* 868 F.Supp. 1047, 1054 (C.D.Ill.1994) ("Lower federal courts which have addressed the issue of the assignability of RICO claims have universally found that they are assignable."); *Nicolls Pointing Coulson, Ltd. v. Transportation Underwriters of La., Inc.,* 777 F.Supp. 493, 495 (E.D.La.1991) ("[D]istrict courts in other circuits have uniformly held that RICO treble damages claims are assignable."); *Federal Ins. Co. v. Parello,* 767 F.Supp. 157, 163 (N.D.Ill.1990) ("There is very little room to argue that Congress would intend to allow the assignment of antitrust claims and would prohibit the assignment of RICO claims."); *In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litig.,* 636 F.Supp. 1138, 1155–56 (C.D.Cal.1986) ("Permitting the assignment of RICO claims ... would not restrict RICO's scope, but would serve to effectuate RICO's 'broad remedial purposes'.").

■ A number of courts have agreed that a subrogee can assert a RICO claim. *See, e.g., Ramos v. Patrician Equities Corp.,* 1993 WL 58428 (S.D.N.Y. March 3, 1993) (surety allowed to assert RICO claims of defaulting investors); *Federal Ins. Co. v. Ayers,* 760 F.Supp. 1118, 1119–20 (E.D.Pa.1990); *Securities Investor Protection Corp. v. Poirier,* 653 F.Supp. 63, 65–66 (D.Or.1986); *General Accident Ins. Co. of Am. v. Fidelity & Deposit Co. of Md.,* 598 F.Supp. 1223, 1246 (E.D.Pa.1984).

The Supreme Court has assumed, for purposes of argument, that it was proper for a plaintiff to assert a subrogated RICO claim. *See Holmes,* 503 U.S. at 271, 112 S.Ct. 1311. Analogous precedent in this circuit includes *Redington v. Touche Ross & Co.,* 592 F.2d 617, 624 (2d Cir.1978), *rev'd on other grounds,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), in which the court of appeals allowed the plaintiff to

bring an equitable subrogation claim under the securities laws.

### 2. Pecuniary Losses Associated With Personal Injuries

■ Defendants suggest that the plaintiffs cannot have a subrogated RICO claim because the subrogee plaintiffs "stand in the shoes" of their subrogors and, they argue, the subrogors themselves have no RICO claims for the economic injuries associated with treatment of smoking related illnesses.

The defendants' analysis is unpersuasive. The recovery of pecuniary losses associated with physical injuries directly caused by racketeering conduct is consistent with the language of the RICO statute. Such claims, furthermore, would materially advance the statute's legislative purposes of deterring racketeering, in all its forms, and of remedying, as fully as practicable, the economic consequences of racketeering. Finally, the recovery of these pecuniary losses is consistent with the expansive scope of RICO's civil remedy provisions as consistently interpreted by the Supreme Court.

### a. Statutory Language

The most natural reading of the language in RICO supports the conclusion that pecuniary losses resulting from racketeering and causing personal injuries should be compensable under the statute. The statute confers standing on "[a]ny person injured in his business or property by reason of [racketeering acts defined in the statute]." 18 U.S.C. § 1964(c).

Money, the Supreme Court has recognized in another context, is a form of property. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 338, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("[T]he word 'property' has a naturally broad and inclusive meaning. In its dictionary definition and in common usage 'property' comprehends anything of material value owned or possessed. Money, of course, is a form of property." (citation omitted)).

Victims of racketeering who have been deprived of their monetary resources as a direct result of racketeers' predicate acts should, under the most natural interpretation of the phrase "business or property," recover their pecuniary losses.

A hypothetical will illustrate the anomaly of the restrictive interpretation of the statutory language proposed by the defendants. Assume racketeers attack a manufacturing plant to coerce its owner and an employee, and in so doing throw the owner and her employee through a window. Defendants argue that the racketeers should be made to pay for the costs of the broken window under RICO, but not for the pecuniary costs, such as medical bills or lost wages and profits, associated with the broken arms and legs of the owner and employee. A line must be drawn under the "business and property" rubric of the statute, but it would seem more sensible to draw it between pain and suffering and outlays for repairing windows and limbs.

Limitations of the phrase "business and property" in the antitrust context do not apply to RICO. In an antitrust case, the Supreme Court stated that the phrase "business or injury" excludes "personal injuries suffered." *Reiter*, 442 U.S. at 339, 99 S.Ct. 2326. The Court's use of the term "personal injuries" in *Reiter* may simply have been a reference to claims for emotional distress or pain and suffering. Even if the Court intended the phrase to refer to the pecuniary losses associated with personal injury, however, it would be inappropriate to apply this phrase in the RICO context. While analogies between RICO and the Clayton Act can be instructive, there are sharp differences between the two statutes and their aims which can sometimes render such comparisons inappropriate. A version of RICO was originally proposed in the Senate as an amendment to the Clayton Act. *See* S.2048, 90th Cong. (1967). Congress ultimately rejected the notion that RICO should be a subsection of the antitrust laws, apparently for the reason that it did not want RICO

to be limited by existing interpretations of antitrust law. *See, e.g.,* 115 Cong. Rec. 6994 (1969) (recommendation of American Bar Association against attaching RICO to Clayton Act because the "use of antitrust laws themselves as a vehicle for combating organized crime could create inappropriate and unnecessary obstacles" to private litigants by requiring them to "contend with a body of precedent-appropriate in a purely antitrust context-setting requirements on questions such as 'standing to sue' and 'proximate cause'"); *see also* 115 Cong. Rec. 6993 (1969) (statements of Sen. Hruska).

RICO standing has been interpreted much more broadly than antitrust law standing which, for example, contains an "antitrust injury" requirement. The concerns which animated RICO were different from those which inform the interpretation of the antitrust statutes. As noted below, RICO was an attempt to deter racketeering in all is aspects, including physical violence aimed at the person, and to remedy the full range of economic consequences of racketeering. Physical violence and attacks upon the person were standard tools of racketeers that RICO was designed to address; such attacks are specifically proscribed by the statute. The two statutes' coverage of "personal injuries" are not fully congruent.

Most importantly, the RICO statute contains an express admonition that the statute be read broadly in order to effectuate its policies. It provides that, "[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes." Pub.L. No. 91–452, § 904(a), 84 Stat. 922, 947 (1970); *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach but also of its express admonition . . . ." (citation omitted)). The statute's "liberal construction" provision is particularly applicable to the civil remedies contained in section 1964. *See Sedima,* 473 U.S. at 491 n.10, 105 S.Ct. 3275 ("Indeed, if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident.").

While the phrase "business and property" could be interpreted to exclude all pecuniary losses associated in any way with a personal injury, such an interpretation would undermine the policies of RICO.

### b. Legislative Purpose

Analysis of the statute's legislative history confirms that RICO was intended to deter the use of physical violence by racketeers and to remedy the economic consequences of those physical injuries resulting from racketeering violence.

In enacting RICO, Congress recognized that the use and threat of physical violence were traditional tools of the racketeer and that the infliction of personal injuries could result in substantial economic losses to the victims of racketeering. During the bill's debate, RICO's co-sponsor in the Senate summarized the problem Congress faced: "[Organized Crime] employs physical brutality, fear and corruption to intimidate competitors and customers to achieve increased sales and profits." 116 Cong. Rec. 602 (1970) (statement of Sen. Hruska); *see also* 113 Cong. Rec. 17998 (1967) (Sen. Hruska, during consideration of a precursor to RICO, describing tools of racketeers as "large amounts of cash coupled with threats of violence, extortion, and similar techniques").

This concern for the economic consequences of the physical injuries caused by racketeers led Congress to include numerous references to personal injury offenses in RICO's definition of "racketeering activity." RICO's definition of "racketeering activity" includes, for example, "any act or threat" involving murder, kidnaping, robbery, and extortion, which is chargeable under State law and punishable by imprisonment for more than one year. 18 U.S.C.

§ 1961(1). In addition, RICO's definition of predicate racketeering acts includes violations of federal laws designed to control damages to the person. *See, e.g.,* 18 U.S.C. § 1513 (retaliating against a witness, victim, or informant), § 1951 ("Hobbs Act," proscribing interstate robbery, extortion and any threats or acts of physical violence to any person or property in furtherance of interstate robbery or extortion), § 1958 (use of interstate commerce facilities in the commission murder-for-hire) §§ 2251, 2251A, 2252, 2258 (sexual exploitation of children), and §§ 2421–24 ("white slave" traffic), *found in* 18 U.S.C. § 1961(1).

The commission of a "pattern" of any of these predicate offenses, when committed in conjunction with the statute's other requirements, affords a civil remedy for "any person" who has incurred business or property losses as a result of the commission of the predicate acts. 18 U.S.C. § 1964(c). RICO's legislative scheme evinces a desire on the part of Congress to deter racketeering, in all its forms, including racketeering violence which inflicts personal injuries. As a result, it is reasonable to conclude that RICO is also intended to remedy the range of economic costs of racketeering, including those economic costs racketeers inflict when they choose to achieve their aims through a pattern of violence and physical injury or by fraud calculated to injure the person.

### c. Case Law

The Supreme Court's expansive interpretations of RICO standing support the conclusion that RICO should remedy the pecuniary losses caused by the infliction of personal injuries by racketeers.

In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court rejected an attempt by the court of appeals for the Second Circuit to limit the classes of racketeering victims who can recover under the Act. The court of appeals had held that RICO plaintiffs were required to plead a "racketeering injury" in order to recover

under the statute. In rejecting that ruling the Supreme Court stated:

> Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.

*Sedima,* 473 U.S. at 497, 105 S.Ct. 3275.

When the racketeering conduct involves acts of physical violence and injury, the natural interpretation of the phrase "any recoverable damages ... flow[ing] from the commission of the predicate acts" suggests that those who pay an economic price for the racketeering acts are included in the class of individuals who may recover.

This conclusion is further supported by the fact that the majority in *Sedima* rejected an attempt by the dissent to limit RICO in a manner analogous to that now proposed by the defendants. In *Sedima,* the dissent urged that the direct victims of predicate acts such as murder and kidnaping be excluded from recovery under the statute in order to limit recovery to those parties suffering "commercial" losses. *See Sedima,* 473 U.S. at 519, 105 S.Ct. 3275 (Marshall, J., dissenting) ("Congress' concern was not for the direct victims of the racketeers' acts, whom state and federal laws already protected, but for the competitors and investors whose businesses and interests are harmed or destroyed by racketeers, or whose competitive positions decline because of infiltration in the relevant market."). The majority refused to adopt this approach, reasoning that there was no basis for inferring either a "racketeering injury" requirement or a "competitive inju-

ry" requirement in the statute's language or legislative history. *Id.* at 497 n. 15, 105 S.Ct. 3275 ("The dissent would also go further than did the Second Circuit in its requirement that the plaintiff have suffered a competitive injury.... The language [Congress] chose, allowing recovery to '[a]ny person injured in his business *or property*,' § 1964(c) (emphasis added), applied to this situation, suggests that the statute is not so limited.").

Additional support is provided by the Supreme Court's holding and reasoning in *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). In *Scheidler*, the plaintiffs included two health care centers that provided medical services including abortion. The defendants were a collection of organizations and individuals, some of whom allegedly constituted the RICO "enterprise," who opposed the performance of abortions at these and other health care facilities. In their efforts to prevent abortions at the plaintiff clinics, the defendants allegedly were involved in a pattern of "threatened or actual force, violence, or fear" intended to deter employees and patients from utilizing the clinics' services. *See Scheidler*, 510 U.S. at 253, 114 S.Ct. 798 (quoting plaintiffs' second amended complaint ¶ 97). The plaintiff clinics alleged that these efforts by the defendants had resulted in economic and business losses.

Rejecting several lower court holdings that RICO's civil remedies require racketeering activity that is motivated by an economic purpose, the Supreme Court in *Scheidler* held that the plaintiff clinics' allegations were sufficient to state a claim under RICO:

> [The plaintiffs clinics] alleged in their complaint that respondents conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere. Petitioners claimed that this conspiracy "has injured the business and/or property interests of the [petitioners]." In addition, petition-

ers claimed that respondent Scheidler threatened [plaintiff's] clinic administrator with reprisals if she refused to quit her job at the clinic.... Nothing more is needed to confer standing on [plaintiff clinics] at the pleading stage.

*Scheidler*, 510 U.S at 256, 114 S.Ct. 798 (quoting second amended complaint) (citations omitted).

As the Court's reasoning in *Scheidler* illustrates, RICO provides a civil recovery for businesses which have suffered economic loss as a result of actual or threatened physical violence conducted in a pattern of racketeering. If a business were required to shut down by virtue of racketeering-inflicted personal injuries to its workers, the Court's analysis in *Scheidler* suggests that the business should also be allowed to recover those economic losses resulting from the closure. There appears to be no principled basis for allowing the business to recoup these costs while denying that same right to the injured employees, who also have sustained real pecuniary losses and therefore have been "injured in their property." The encompassing phrase "any person" contained in the statute's standing provision, as well as RICO's mandate to liberally construe the provisions of the statute to effectuate the statute's policies, require that the same remedies available to businesses also be extended to individuals who have sustained economic losses.

It is often difficult to draw a clear distinction between the economic losses borne by individuals and by businesses. In the instant case, where those injured in their "persons" were fortunate to have medical insurance, the costs have ultimately been borne by the Blues who are in the business of providing health care to the nation. These alleged economic injuries to the plaintiffs' business and property have allegedly undermined the financial health and stability of a critical industry in this nation—that devoted to health care of millions of people. *See, e.g.,* Vernellia R. Randall, *Managed Care, Utilization Re-*

view, and Financial Risk Shifting, *17 U. Puget Sound L.Rev. 1, 3 (1994)* ("[T]he costs of health care delivery has increased and has become a national concern."); Peter T. Kilborn, Experts Offer Information About Americans Without Health Insurance, *N.Y. Times, Feb. 26, 1999, at A1* (*43.4 million Americans without insurance,* "adding to the burdens on the nation's health care system"). Employers have even found it increasingly expensive and difficult to fund health care coverage for their own employees. See *Jennifer Steinhauer,* Health Insurance Costs Rise, Hitting Small Business Hard, *N.Y. Times, Jan. 19, 1999, at A1. Businesses have been forced to devote larger and larger portions of their resources to providing health care or have reduced benefits to their workers, compelling taxpayers, the plaintiffs, and premium payers to subsidize the medical treatment of those who can no longer afford insurance. Research or treatment which would have been supported by resources of the health care industry have, it is contended, gone unfulfilled as a result of the defendants' racketeering. This is arguably precisely the type of economic injury which RICO was designed to address and deter.*

A number of courts, including two district courts in this circuit, have accepted or shown a disposition in favor of allowing RICO claims for the pecuniary losses associated with physical injuries caused by racketeering. See *Libertad v. Welch,* 53 F.3d 428, 437 n. 4 (1st Cir.1995) ("Plaintiffs like Libertad and Emancipacion could have standing to sue under RICO, if they were to submit sufficient evidence of injury to business or property such as lost wages or travel expenses, *actual physical harm,* or specific property damage sustained as a result of a RICO defendant's actions." (emphasis added)); *Jerry Kubecka, Inc. v. Avellino,* 898 F.Supp. 963, 968 (E.D.N.Y. 1995) ("If [murder victims] had been merely disabled by the attempt on their lives but survived, presumably they would have had a RICO claim for lost earnings from their business activities because they had

been injured in their 'business or property.'"); *von Bulow v. von Bulow,* 634 F.Supp. 1284, 1309 (S.D.N.Y.1986) ("The cost to [comatose murder target] of her committee and her inability to enjoy her personal and real property may well be compensable monetary injuries under RICO."); *Meyer v. First National Bank & Trust Co.,* 698 F.Supp. 798, 803 (D.N.D. 1987) (interpreting *Sedima,* "[t]he direct damages resulting from the predicate acts would also be compensable (i.e., recovery for the cost of a burned building, *or personal injury resulting from threats* ), just as damages for 'infiltration injury' to a legitimate business enterprise would be compensable." (emphasis added)); *Hunt v. Weatherbee,* 626 F.Supp. 1097, 1100–1101 (D.Mass.1986) (sexual discrimination and harassment victim allowed to seek lost wages under RICO); *Rice v. Janovich,* 109 Wash.2d 48, 742 P.2d 1230, 1237–38 (1987) (assault victim allowed to seek lost wages under RICO).

The plaintiff in *Rice,* a night watchman and janitor at a business establishment, was allegedly assaulted and beaten while his place of employment was fire bombed. The court concluded that the plaintiff's loss of wages was a compensable injury under RICO:

> The defendants' arguments that plaintiff's claim for lost wages should not be within the scope of injuries recoverable under RICO conflict with these conclusions in *Sedima.* Injuries resulting from the predicate offenses are compensable under the act. The scope of recoverable damages for injury "in his business or property" is to be broadly construed.... The narrow interpretation of "business and property" advocated by the defendants, based upon analogy to numerous cited cases of antitrust law, has been rejected by the Supreme Court.

*Rice,* 742 P.2d at 1237.

Other courts have allowed recovery for lost wages outside the "personal injury"

context. *See, e.g., Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1170 (3d Cir. 1989) (allowing RICO claim stating, "loss of earnings, benefits, and reputation constitute self-evident injury as in any standard wrongful discharge action"); *Snead v. Hygrade Food Prods. Assocs.,* 1998 WL 910223, at *3 (E.D.Pa.1998) (claims for economic damages resulting from loss of employment allowed under RICO); *Reynolds v. Condon,* 908 F.Supp. 1494, 1517–19 (N.D.Iowa 1995) (claims for loss of income or employment opportunities compensable under RICO); *Rodonich v. House Wreckers Union,* 627 F.Supp. 176, 180 (S.D.N.Y. 1985) (lost wages claim allowed under RICO); *Callan v. State Chem. Mfg. Co.,* 584 F.Supp. 619, 623 (E.D.Pa.1984) (claim for lost income from plaintiffs' discharge allowed under RICO); *cf. In re Cordis Corp. Pacemaker Product Liab. Litig.,* 1992 WL 754061, at *3 (S.D.Ohio 1992) (medical costs associated with implanting and explanting defective pacemakers "property" under RICO).

### d. RICO Limitations In Other Circuits

Defendants' support their position by reference to the holdings in some other circuits which have not allowed the pecuniary losses due to "personal injuries." *See, e.g., Bast v. Cohen, Dunn & Sinclair, P.C.,* 59 F.3d 492 (4th Cir.1995); *Doe v. Roe,* 958 F.2d 763, 770 (7th Cir.1992); *Oscar v. University Students Co-operative Ass'n,* 965 F.2d 783 (9th Cir.1992); *Genty v. Resolution Trust Corp.,* 937 F.2d 899 (3d Cir. 1991); *Grogan v. Platt,* 835 F.2d 844, 848 (11th Cir.1988); *Drake v. B.F. Goodrich Co.,* 782 F.2d 638, 643–44 (6th Cir.1986). *But see Libertad v. Welch, supra,* 53 F.3d at 437 n. 4. To date the court of appeals for the Second Circuit has not cited these negative holdings of other circuits as binding.

Defendants' citation to *Bankers Trust Co. v. Rhoades* 741 F.2d 511 (2d Cir.1984), *vacated by* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985), is unavailing. *See id.* at 515 (reasoning that plaintiff must show a "propriety type of damage" which does not include "personal injuries"). The facts of *Bankers Trust* did not involve personal injuries and did not present the court with the unique issue of whether pecuniary damages associated with personal injuries are compensable under the statute. The decision in *Bankers Trust,* furthermore, was issued one day after the Second Circuit's decision in *Sedima* and espoused the same restrictive approach to RICO rejected by the Supreme Court in *Sedima. Bankers Trust* was vacated and remanded for further consideration by the Court the day after its decision in *Sedima. See* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985). The court of appeal's subsequent opinion in *Bankers Trust* did not contain language attempting to define the types of injury encompassed by the phrase "business of property." *See* 859 F.2d 1096, 1100 (2d Cir.1988). The issues now before this court are not controlled by a passing phrase of dictum embedded in a pre-*Sedima* holding that was ultimately vacated by the Supreme Court.

In *Grogan,* the court of appeals for the Eleventh Circuit recognized that there was "some merit" in allowing the pecuniary costs of personal injuries to be recovered under RICO. *See Grogan* 835 F.2d at 848; *see also Doe,* 958 F.2d at 770 (acknowledging that economic aspects of personal injuries could, "as a theoretical matter," be viewed as injury to business or property). Nevertheless, the court in *Grogan* refused to allow injured FBI agents and the estates of murdered agents to seek the pecuniary losses they allegedly suffered as a result of predicate acts of racketeering. *Id.* at 847. The court based its conclusion in part on the observation that "pecuniary and non-pecuniary aspects of personal injury claims ... are often to be found, intertwined, in the same claim for relief." *Id.*

The courts reasoning in *Grogan* is not controlling. The pecuniary and non-pecuniary aspects of tort claims are not "intertwined" in a way that prevents the courts from treating the two sets of claims differ-

ently. Subrogation, where pecuniary claims of subrogees are often separated from non-pecuniary claims of subrogors, is one example of how the two types of claims are distinguished by courts and treated separately. *See, e.g., Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 209 (2d Cir.1985) ("These two claims [of subrogor and subrogee] are separate and distinct, and do not constitute unlawful splitting under New York law."); *Fidelity & Deposit Co. of Md. v. Gaspard,* 1997 WL 335598, at *2 (E.D.La.1997) ("Since the two claims [of subrogee and subrogor] against [defendant] are distinct, a judgement rendered in the absence of [subrogor] would have no prejudicial affect on him."); *Winkelmann v. Excelsior Ins. Co.,* 85 N.Y.2d 577, 582, 626 N.Y.S.2d 994, 650 N.E.2d 841 (1995) ("The claims of the insurer for amounts paid by it and the insured's claim for uninsured losses are divisible and independent, and '[p]ermitting the insurer to sue … as equitable subrogee does not affect the insured's right to sue for the amount of the loss remaining unreimbursed.'" (quoting *Federal Ins. Co. v. Arthur Andersen & Co.,* 75 N.Y.2d 366, 374, 553 N.Y.S.2d 291, 552 N.E.2d 870 (1990))).

■ Under federal law, subrogees and subrogors are allowed to pursue their claims in separate actions. *See, e.g., Virginia Elec. & Power Co. v. Westinghouse Elec. Corp.,* 485 F.2d 78, 84 (4th Cir.1973) ("Either party may bring the suit—the insurer-subrogee to the extent it has reimbursed the subrogor, or the subrogor for either the entire loss or only its unreimbursed loss."); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1546, at 360 (2d ed.1990) ("Either the insured or the insurer may sue."). The general rule in federal courts is that the insured is not an indispensable party under Rule 19 and need not be joined in the subrogee's action against the tortfeasor if joinder would deprive the court of subject matter jurisdiction. *See, e.g., United States v. Aetna Cas.*

*& Surety Co.,* 338 U.S. 366, 382 n. 19, 70 S.Ct. 207, 94 L.Ed. 171 (1949) (insureds and insurers "clearly not 'indispensable' parties"); *Krueger v. Cartwright,* 996 F.2d 928, 934 (7th Cir.1993) ("We agree with the majority of courts that have addressed the issue and applied this principle [that neither is indispensable] as a general rule in cases of partial subrogation.").

As the example provided by subrogation suggests, there is no conceptual or practical difficulty in separating the "intertwined" pecuniary and non-pecuniary aspects of personal injury claims. *See also, e.g.,* N.Y. C.P.L.R. 4111(d), (e) & (f) (New York juries, including those trying cases in federal courts applying New York substantive law, are required to itemize verdicts separating items of pecuniary and "non-pecuniary," including pain and suffering, damages). It would be inappropriate to frustrate the policies of RICO on the theory that the two types of claims—pecuniary and non-pecuniary—are "indivisible."

In *Genty,* 937 F.2d 899 (3d Cir.1991), the court of appeals for the Third Circuit rejected the plaintiffs' pecuniary claims in part because of the existence of alternative state law remedies. *See* 937 F.2d at 918 ("Ample law already existed [at the time of RICO's passage] to provide recovery for wrongfully inflicted personal injuries. The unavailability of a civil RICO treble damages action for personal injuries in no way restricts the plaintiff's right to bring a pendent state wrongful death or personal injury action along with a RICO action for damages to business or property.").

The fact that alternative state law remedies may exist for victims of personal injury caused by racketeering is not a dispositive factor in the interpretation of the statute. There are alternative remedies for every injury caused by the predicate acts of racketeers. A victim whose window or arm was broken by racketeering has a number of alternative tort claims from which to choose. The purpose of RICO was to superimpose another layer

of remedies in order to deter racketeering. As the statute's preface states, RICO is designed to "seek the eradication of organized crime in the United States ... by providing *enhanced sanctions and new remedies.*" Pub.L. No. 91–452, § 1, 84 Stat. 922, 923 (1970) (emphasis added).

Similar attempts to limit RICO on the theory that it was not intended to supplant traditional remedies have been rejected by the Supreme Court. In *Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482 (2d Cir.1984), *rev'd,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the court of appeals for the Second Circuit held that RICO plaintiffs were required to assert a "racketeering injury" in order to recover under RICO. The court based its conclusion in part on the assumption that Congress would not have wanted to provide additional remedies for already compensable injuries. *See* 741 F.2d at 494 n.37 (" 'State law offenses are not the gravamen of RICO offenses. RICO was not designed to punish state law violations.' " (quoting *United States v. Forsythe,* 560 F.2d 1127, 1135 (3d Cir.1977))).

The Supreme Court rejected the court of appeal's reasoning as contradictory to the plain meaning of the statute. It pointed out that, "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima,* 473 U.S. at 498, 105 S.Ct. 3275.

The court of appeal's effort to limit RICO's standing provision in *Sedima* was also motivated in part by the court's fear of the effect of expansion of the statute into new areas. *See Sedima,* 473 U.S. at 499, 105 S.Ct. 3275 ("Underlying the Court of Appeals' holding was its distress at the 'extraordinary, if not outrageous,' uses to which civil RICO has been put. Instead of being used against mobsters and organized criminals, it has become a tool for everyday fraud cases brought against 'respected and legitimate "enterprises." ' " (quoting 741 F.2d at 487)).

The Supreme Court criticized the attempt to limit the statute's scope when such a limitation contradicted the statute's language and policies. It stated:

> Though sharing the doubts of the Court of Appeals about this increasing divergence, we cannot agree with either its diagnosis or its remedy. The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern." We do not believe that the amorphous standing requirement imposed by the Second Circuit effectively responds to these problems, or that it is a form of statutory amendment appropriately undertaken by the courts.

*Sedima,* 473 U.S. at 500, 105 S.Ct. 3275; *cf. Blue Shield of Va. v. McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("Consistent with the congressional purpose, we have refused to engraft artificial limitations on the [standing provision of the Clayton Act].").

Similarly, in *Scheidler* the Supreme Court rejected efforts by the lower courts to reign in RICO by engrafting a requirement that the racketeering injury be "motivated by an economic purpose." *Scheidler,* 510 U.S. at 262, 114 S.Ct. 798 (" '[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.' " (quoting *Sedima,* 473 U.S. at 499, 105 S.Ct. 3275 (quoting *Haroco, Inc. v. American Nat'l. Bank & Trust Co.,* 747 F.2d 384, 398 (7th Cir. 1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)))).

As in *Sedima* and *Scheidler,* the exclusion of an entire class of pecuniary losses in the present litigation from the statute's reach would contravene the comprehensive Congressional scheme, contradict the most natural reading of the statute's language, and result in the underenforcement of the statute's policies. The interpretations of

RICO relied upon by defendants are reminiscent of earlier attempts to engraft artificial limitations upon the standing provisions of RICO. Attempts to handcuff RICO have been rejected by the Supreme Court since the statute's plain language and legislative history call for a freer and more expansive interpretation.

### e. *Laborers Local 17*

The defendants final argument is that the plaintiffs' subrogated RICO claims should be denied based on a paragraph of dictum contained in *Laborers Local 17*. In *Laborers Local 17*, the court of appeals recognized that the union trust funds retained their right to bring claims as subrogees notwithstanding the holding that their "direct" claims were barred. In contrast to the two instant cases, in *Laborers Local 17* the position of the plaintiff trust funds was, for tactical purposes, that the smokers did *not* possess a RICO claim for the economic damages associated with the medical treatment of tobacco use. In dictum the court of appeals accepted the plaintiffs' position, concurred in by defendants for arguments sake, as a correct statement of law:

> The Funds correctly note that these RICO causes of action could not be asserted by the smokers or by the Funds in a subrogation action because the RICO statute requires an injury to "business or property," whereas the smokers' injuries are personal in nature.... The Funds may still bring a subrogation action to recover the medical costs paid out for the individual smokers.... Although these will not be RICO claims, they will remedy the harm done by defendants' alleged misconduct.

*Laborers Local 17*, 191 F.3d at 241.

Defendants suggest that this passage of dictum in *Laborers Local 17* should be interpreted as a holding by the court of appeals for the Second Circuit that smokers do not possess a RICO claim for the economic damage resulting from the medical treatment of tobacco use.

The argument is not persuasive. This circuit's court of appeals has recently cautioned against placing too heavy reliance on judicial dictum:

> The rationale for the principle that preclusive effect will be given only to those findings that are necessary to a prior judgment is that "a collateral issue, although it may be the subject of a finding, is less likely to receive close judicial attention and the parties may well have only limited incentive to litigate the issue fully since it is not determinative."

*United States v. Hussein,* 178 F.3d 125, 129 (2d Cir.1999) (quoting *Commercial Assocs. v. Tilcon Gammino, Inc.,* 998 F.2d 1092, 1097 (1st Cir.1993)).

The plaintiffs in *Laborers Local 17* did not advance a subrogated claim in their pleadings. The plaintiffs never argued before the district court or the court of appeals that they possessed a subrogated RICO claim. To the contrary, as noted, they suggested, *arguendo,* that the smokers did *not* possess a RICO claim for their economic injuries. The court of appeals' dictum appears to represent an assumption the court made for purposes of argument rather than an attempt to definitively state an important new rule of law on a complex and controversial issue without the benefit of adverse briefing, argument of counsel, or its own analysis. Such a leap to bind future parties actually litigating the issue for the first time would constitute an extraordinary and dangerous development in the common law process.

When both parties advocated the same view with respect to the pecuniary damages related to personal injuries, the *Blue Cross* memorandum accepted, in dictum, some of the views expressed in other circuits with respect to RICO claims for such injuries. *See Blue Cross,* 36 F.Supp.2d at 571 ("In all the cases where pecuniary damages were not allowed, the gravamen of the plaintiffs' claims was for personal injuries."). After adverse briefing from

counsel and an extended opportunity to analyze the statutory text, case law, and legislative history, conclusions which differ from the *Blue Cross* dictum are required. The court of appeals may reach the same conclusion favoring plaintiffs' subrogation claims if the issue were squarely presented on appeal by parties with a full incentive to litigate.

■ In summary, the plaintiffs' complaints in both Blue Cross and National Asbestos are sufficient to state a subrogated claim under federal RICO. According to the allegations, the plaintiffs qualify as subrogees of the smokers who have been injured economically as a result of the misconduct of the defendants. Plaintiffs have allegedly expended billions of dollars in the treatment of smoking related diseases. These payments were made as part of the plaintiffs' legal obligations to their subrogors. Any challenges to the plaintiffs' positions as proper subrogees raises factual issues best addressed at a later stage of these litigations. The factual allegations contained in the complaints are sufficient to state a cause of action under RICO. *See Blue Cross,* 36 F.Supp.2d 560, 565–68 (E.D.N.Y.1999).

### C. Aggregation Of Claims

■ Defendants objections to the plaintiffs' "aggregation of claims" are misplaced at this stage of the litigation. As subrogees, the plaintiffs are real parties in interest who possess their own substantive rights. *See, e.g., United States v. Aetna Cas. & Surety Co.,* 338 U.S. 366, 379, 70 S.Ct. 207, 94 L.Ed. 171 (1949) ("[B]oth the insured and insurer ... have substantive rights against the tortfeasor which qualify them as real parties in interest."). As real parties in interest, plaintiffs have a right, pursuant to Rule 18, to join as many claims as they have against a defendant. *See* Fed.R.Civ.P. 18(a) ("A party asserting a claim to relief ... may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as the party has against an opposing par-

ty."). In contrast to the class action context, furthermore, a subrogee may aggregate its own claims to meet the amount-in-controversy requirement of diversity jurisdiction. *See Allstate Ins. Co. v. Hechinger Co.,* 982 F.Supp. 1169, 1172 (E.D.Va.1997) ("[A]s real party in interest, the insurer-subrogee owns the substantive rights on which it sues. Therefore, just as an individual can aggregate the claims it owns to meet the jurisdictional amount, so, too, can a subrogee aggregate the claims to which it is subrogated, and hence owns, to meet the jurisdictional amount." (citations omitted)); *Ministry of Health v. Shiley Inc.,* 858 F.Supp. 1426, 1431 (C.D.Cal.1994) (allowing subrogee to aggregate its own claims, distinguishing between class action context and aggregation by subrogee); *Liberty Mut. Ins. Co. v. Tel–Mor Garage Corp.,* 92 F.Supp. 445, 446 (S.D.N.Y.1950) ("Combining the [subrogee's] three claims to constitute the required jurisdictional amount was proper." (citations omitted)).

Defendants' "aggregation" objections amount to an assertion that the plaintiffs' pleadings do not demonstrate that they are entitled to the relief they request. In particular, defendants contend that plaintiffs have not alleged sufficient facts with respect to their subrogors, for example, the injuries each has suffered, the dates of each injury, and the brands of cigarettes each has smoked. These objections are more properly presented in the context of Federal Rules of Civil Procedure Rule 12(e) (motion for more definite statement) or Rule 8(a) (pleading claim for relief).

■ The federal rules of procedure employ liberal standards for pleading under Rule 8(a) (requiring "short and plain statement" showing party is entitled to relief). A party is not required to allege every particular and detail at the pleading stage. If defendants were correct, complaints in complicated and large cases such as this one would run into the thousands of pages. As the Second Circuit has explained:

[S]uch pleading of the evidence is surely not required and is on the whole undesirable. It is a matter for the discovery process, not for allegations of detail in the complaint. The complaint should not be burdened with possibly hundreds of specific instances; and if it were, it would be comparatively meaningless at trial where the parties could adduce further pertinent evidence if discovered. They can hardly know all their evidence, down to the last detail, long in advance of trial.

*Nagler v. Admiral Corp.*, 248 F.2d 319 (2d Cir.1957); *see also Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[A]ll the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.... Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.").

The 205 page complaint in *Blue Cross* and the 87 page complaint in *National Asbestos* have set out sufficient facts, including detailed allegations with respect to the defendants' conduct, to give defendants "fair notice" of the plaintiffs' claims. The discovery process and Rule 16 conferences can be expected to identify further elements of both parties' claims.

Defendants aptly point out that plaintiffs face substantial difficulties in establishing numerous aspects of their claims, for example, issues related to causation. That fact, however, is not sufficient reason for dismissing the claims at the pleading stage.

Defendants' suggestion that the plaintiffs' claims should be dismissed because the plaintiffs "intend" to utilize improper and "unconstitutional" methods of statistical analysis to prove elements of their case is not a proper argument for a motion addressed to the pleadings. Whether plaintiffs will be allowed to use statistical methods of proof, and if so in what contexts, is an issue that can only be determined during and after the discovery process. The defendants' argument that plaintiffs will not be able to prove *all* their claims without recourse to "unconstitutional" means is no reason for striking, with prejudice, all the plaintiffs' claims or for attempting to winnow those claims without the benefits of discovery. Plaintiffs have alleged sufficient facts in their complaint to establish that, if proven, they are entitled to some relief. The appropriate time to determine how much relief they may be entitled to is after discovery reveals how many, if any, of their allegations they can prove.

The flexibility in structuring the litigation provided by the Federal Rules of Civil Procedure will help ensure that the rights of all parties will be protected throughout the litigation. *See, e.g.,* Letter dated September 2, 1999 to magistrate judge by attorney for plaintiff suggesting "staged" discovery and trial.

## D. State Claims

So much effort has already been invested in these cases that it is prudent to exercise supplemental jurisdiction over the state law claims in Blue Cross pursuant to section 1367 of title 28. The validity of the Blues' state law claims remain unaddressed by *Laborers Local 17.* These state law claims provide an independent basis for this court's retention of jurisdiction over Blue Cross. The case was filed in this court more than sixteen months ago. After more than a full year of discovery and motion practice, considerations of efficiency and fairness dictate that the parties be allowed to continue their closely related suits in this court.

The viability of state law claims has not been fully briefed. Discovery on all claims—federal and state—appears at this pleading stage to be essentially the same.

## IV. CONCLUSION

The motions to dismiss the amended complaints in Blue Cross and National Asbestos are denied. Discovery is to proceed under the close supervision of the magistrate judge with every effort made to limit the costs and to utilize materials already available from sources in the many tobacco litigations in state and federal courts. Both the magistrate judge and the district judge will entertain suggestions for effectively structuring the litigation.