**RHODE ISLAND LABORERS' HEALTH & WELFARE FUND, by and through its TRUSTEES, on behalf of all other similarly situated Health & Welfare Funds in the State of Rhode Island, Plaintiff,**

v.

**PHILIP MORRIS, INC.; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; B.A.T. Rillard Tobacco Company; Liggett Group, Inc.; The American Tobacco Company; The Council for Tobacco Research–U.S.A.; The Tobacco Institute, Inc.; and Hill & Knowlton, Inc., Defendants.**

No. 97–500L.

United States District Court, D. Rhode Island.

June 1, 2000.

---

**176**

Amato A. DeLuca, DeLuca & Weizenbaum, Ltd., Providence, RI, Peter N. Wasylyk, Providence, RI, Wood Roberson Foster, Jr., Jordan Matthew Lewis, Siegel, Brill, Greupner & Duffy, Milwaukee, WI, for Plaintiffs.

Steven E. Snow, Brian Clifford Newberry, Partridge, Snow & Hahn, Providence, RI, for Defendants.

### OPINION AND ORDER

LAGUEUX, District Judge.

This matter is before the Court on plaintiff's objection to Magistrate Judge Robert W. Lovegreen's Report and Recommendation opining that this Court should grant the motions of defendants to dismiss the complaint in its entirety. The underlying issue in this matter is whether the alleged injury to plaintiff, Rhode Island Laborers' Health and Welfare Fund (the "Fund"), resulting from the defendants' alleged wrongdoing is proximate enough to permit the bringing of a class action against the tobacco companies and their lobbying and public relations agents for alleged violations of the federal and state Racketeer Influenced and Corrupt Organizations Act ("RICO"), federal and state antitrust laws, state common law relating to fraud, and failure to perform a special duty, and the Rhode Island Unfair Trade Practice Act ("RIUTPA"). Simply put, the issue is one of causation: did the defendants' alleged wrongdoing proximately cause the Fund to make medical payments on behalf of smokers to redress their smoking related injuries. The Fund argues that the magistrate judge erred in recommending that defendants' motions to dismiss be granted. For the reasons briefly set forth below, this Court adopts the thoughtful Report and Recommendation of the Magistrate Judge after briefly discussing the cases decided on this point since its issuance.

### I. Standard of Review

■ In reviewing a Magistrate's Judge's Report and Recommendation,

"[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence, or recommit the matter to the magistrate judge with instructions."

28 U.S.C. § 636(b)(1)(C)(1994); see also Fed.R.Civ.P. 72(b). In reviewing a Magistrate Judge's recommendations, the district court must actually weigh the evidence presented to the Magistrate Judge, and not merely rely on the Magistrate Judge's Report and Recommendation. See United States v. Raddatz, 447 U.S. 667,

675, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Gioiosa v. United States,* 684 F.2d 176, 178 (1st Cir.1982).

Defendants' underlying motion was for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). In ruling on a motion to dismiss, the Court construes the complaint in the light most favorable to plaintiff, taking all well pleaded allegations as true and giving plaintiff the benefit of all reasonable inferences. *See Figueroa v. Rivera,* 147 F.3d 77, 80 (1st Cir.1998). Dismissal under Rule 12(b)(6) is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Hishon v. King and Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); 5A Wright and Miller, *Federal Practice and Procedure* § 1357 (1990). However, "minimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988). The standard "does not mean ... that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized. '[E]mpirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." *United States v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir. 1992) (citations omitted).

## II. Discussion

The Court referred these motions to the Magistrate Judge for his preliminary review, findings and recommended disposition. *See* 28 U.S.C. § 636(b)(1); D.R.I.Loc.R. 32(c). After careful consideration, Magistrate Judge Lovegreen agreed with the reasoning set forth in the Circuit Court opinions and a large number of District Court decisions that have rejected similar health care trust fund claims. He concluded that the alleged loss suffered by these funds is too remote to justify direct recovery for any alleged

antitrust, RICO violations, or state law violations committed by the tobacco companies. At the time of the issuance of the Report and Recommendation three Circuit Courts had rejected similar complaints filed around the country by other health care trust funds. *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 239 (2nd Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957, 966 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 932–34s (3rd Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000). Since that time two more Circuit Courts have dismissed almost identical claims. *See Texas Carpenters Health Benefit Fund v. Philip Morris, Inc.,* 199 F.3d 788, 789 (5th Cir.2000); *International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.,* 196 F.3d 818, 823–24 (7th Cir.1999). In addition, the United States Supreme Court denied certiorari in these cases. Therefore, it is clear that at this time the federal appellate courts are unanimous in ruling that the principles of proximate cause and remoteness of injury preclude health funds from recovering damages for injuries which are wholly dependent upon the actions of more directly injured parties.

At oral argument, in support of its objection to the Magistrate Judge's report and in its subsequent submissions with this Court, plaintiff primarily relies upon a recent district court case which permitted the RICO claims to go forward. Since that time another District Court has made a similar holding. Therefore, this Court believes it should discuss these two recent decisions that have bucked the trend. *See Service Employees Int'l Union Health and Welfare Fund v. Philip Morris, Inc.,* 83 F.Supp.2d 70, 88 (D.D.C.1999); *The National Asbestos Workers Medical Fund v.*

*Philip Morris, Inc.,* 74 F.Supp.2d 221, 228 (E.D.N.Y.1999).

In *National Asbestos Workers,* Judge Weinstein decided not to dismiss the direct RICO claims against the tobacco companies because the plaintiffs in that case "also amended their complaint to state a valid, alternate basis for recovery under RICO." 74 F.Supp.2d at 228. They added "RICO causes of action under a theory of subrogation." *Id.* The holding in *National Asbestos* has little, if any, relevance to the present case for two reasons. First, plaintiff in this case has not amended its complaint to include a RICO cause of action under a subrogation theory. More importantly, this Court disagrees with the reasoning and result in *National Asbestos.* Indeed, the Court there recognized that "dismissal of the plaintiffs' [direct] RICO claims might arguably be warranted" because there existed controlling precedent on this precise issue decided by the Second Circuit Court of Appeals only months previously. *Id.* (discussing *Laborers Local 17,* 191 F.3d at 239). In fact, the Seventh Circuit Court of Appeals, in its decision to dismiss such third-party insurer claims, noted that the *National Asbestos* decision "is a thinly disguised refusal to accept and follow the second circuit's holding." *Int'l Brotherhood of Teamsters,* 196 F.3d at 827. In short, this writer does not find the *National Asbestos* case to be persuasive.

■ The decision in *Service Employees* does not fare any better. The Court there misapplies the Supreme Court's three factor test for determining if there is proximate cause for RICO standing which was set forth in *Holmes v. Securities Investor Protection, Corp.,* 503 U.S. 258, 268–70, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)(adopting the proximate cause analysis for standing in antitrust cases set forth in *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) and *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 473–75, 102 S.Ct. 2540, 73 L.Ed.2d 149(1982)

for RICO cases). As with antitrust actions, since standing under RICO is determined by common law principles of proximate cause and remoteness of injury, the following three factors as established in *Holmes* apply: (1) Are there more directly injured plaintiffs?; (2) Will there be difficulty in ascertaining plaintiff's damages?; and (3) Is there a possibility of multiple recoveries so that a court would have to fashion complex rules apportioning damages? *See Holmes,* 503 U.S. at 269–70, 112 S.Ct. 1311.

In its discussion of the first factor, the *Service Employees* Court reasoned that the health care trust funds were the only parties "who can bring suit on behalf of the trust assets." 83 F.Supp.2d at 86. While it is unclear whether the fund participants could bring a RICO claim themselves, *but see Int'l Brotherhood of Teamsters,* 196 F.3d at 825–26 (stating that individual smokers could bring their own RICO suits), they could certainly bring a traditional tort suit. The proper inquiry under the first *Holmes* factor is whether there is a more appropriate plaintiff to right defendants' wrongs, not whether that more directly injured plaintiff can successfully recover the indirect harm caused to a third party. In this case, the more directly injured parties are the smokers themselves. The principle of proximate cause contemplates that there may be some injuries which flow from a defendant's wrongdoing which the law will not redress. Such is the case here.

Even a cursory examination of the second *Holmes* factor leads to the inevitable conclusion that a court would have difficulty ascertaining damages sustained by the Fund, since the actions of the individual smokers stand between the alleged wrongful conduct and the medical payments made by the Fund. As a result, ascertaining damages would require layers of hypothetical models speculating as to the actions of the Fund, the smokers, and the interplay between the actions of both, had

there been full disclosure regarding the harmfulness of cigarettes. The *Service Employees* Court brushed this factor aside by stating that it is too early in the litigation to determine whether plaintiff can conclusively proof the damages suffered by the funds. *See* 83 F.Supp.2d at 87.

With respect to the final factor, the Court relied heavily on the erroneous argument that the "single satisfaction rule" eliminates any risk of multiple recoveries because it "would allow Defendants to get credit for damages paid to these Plaintiffs should there be any subsequent lawsuits awarding damages to Fund participants ..." *Id.* at 88 (citing *Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 734 (D.C. 1987)). After reading *Lamphier*, it is clear that the "single satisfaction rule" only prevents a single plaintiff from recovering twice. *Lamphier*, 524 A.2d at 734; *see also In re Tobacco/Governmental Health Care Costs Litigation*, 83 F.Supp.2d 125, 131 n. 3 (D.D.C.1999)(recognizing that *Service Employees* misinterpreted the "single satisfaction rule" since "there potentially are multiple plaintiffs seeking compensation for the same injury"). That is not the case here because if the Fund's claims were allowed to go forward, the potential of multiple plaintiffs seeking redress for the same injury would clearly exist. Consequently, a court would have to fashion complex rules for apportioning damages because there would be multiple levels of injured plaintiffs. The *Holmes* Court believed this militated against a finding of proximate cause. *Id.* at 273, 112 S.Ct. 1311. Consequently, it is evident that none of the three *Holmes* factors are satisfied in this situation.

Finally, in *Service Employees*, the Court separated the proximate cause analysis into a discussion of the three *Holmes* factors discussed above, and a discussion of public policy concerns which largely centered upon the forseeability of the risks inherent in the manufacture and sale of cigarettes. *See Service Employees*, 83 F.Supp.2d at 81–85. The problem with this superfluous discussion of the proximate cause issue is that it contravenes the *Holmes* Court's reasoning for articulating the three factors. The *Holmes* factors encompass the forseeability considerations inherent in any proximate cause analysis and those factors were explicitly set forth in order that other courts would not have to go through the intellectual gymnastics required by a proximate cause analysis in RICO cases. All of the courts which have analyzed this issue of proximate cause in RICO cases rely on the *Holmes* factors in their discussion. *See, e.g., Holmes* at 269–74, 112 S.Ct. 1311; *Int'l Brotherhood of Teamsters*, 196 F.3d at 825–27; *Laborers Local 17*, 191 F.3d at 238–41 (discussing the *Holmes* factors as "policy considerations"). Therefore, to separate the analysis into two policy prongs is redundant and totally unnecessary.

In addition, in its discussion of the public policy prong, the *Service Employees* Court concludes that the forseeable effects of the tobacco companies' alleged deceit and conspiracy includes the payment of health care services to all of the fund participants. *Id.* at 84. This Court disagrees. As stated during the discussion of the *Holmes* factors, any medical payments made by the Fund is dependant upon the intervening actions of the individual smokers. Therefore, any indirect harm visited upon the Fund is outside the zone of results which were proximately caused by the tobacco companies' alleged wrongdoing. Quite simply, the Fund is not the proper plaintiff to seek redress for the tobacco companies' wrongdoing under RICO because its injuries are derivative, and too remote. *See Holmes*, 503 U.S. at 274, 112 S.Ct. 1311 ("Allowing suits by those injured only indirectly would open the door to 'massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits.' ")(citing *Associated General Contractors*, 459 U.S. at 545, 103 S.Ct. 897).

### III. Conclusion

For the reasons stated above, this Court concludes that the *National Asbestos* and *Service Employees* decisions were poorly reasoned and are, thus, unpersuasive. The well-reasoned Report and Recommendation of Magistrate Judge Lovegreen therefore, is accepted and adopted and defendants' motions to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) hereby are granted. The Clerks shall enter judgment for all defendants forthwith.

It is so ordered.

### REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

Rhode Island Laborers' Health & Welfare Fund ("Plaintiff" or "Fund") has brought this proposed class action against a number of the leading tobacco companies, their research affiliates, and a public relations firm ("Defendants")[1]. The Fund alleges violation of both the federal and state Racketeer Influenced and Corrupt Organizations Acts ("RICO"), violation of federal and state antitrust law, fraud, failure to perform a special duty, and violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act ("RIUTPA"). Defendants have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. In the alternative, Defendants have moved to dismiss for failure to join a party under Rule 19 pursuant to Fed.R.Civ.P. 12(b)(7). Plaintiff has opposed both motions.

This matter has been referred to me for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). A hearing was held on June 23, 1999. After examining the memoranda submitted, listening to the arguments of counsel, and researching the applicable law, I recommend that Plaintiff's complaint be dismissed in its entirety pursuant to Fed. R.Civ.P. 12(b)(6) and, therefore, Defendants' 12(b)(7) argument will not be addressed.

#### Background

Plaintiff is a nonprofit, multi-employer health and welfare trust fund established through collective bargaining between certain unions and employers. The purpose of the Fund is to provide participants and beneficiaries with comprehensive health care benefits. In connection with such benefits, the Fund alleges that it has expended huge sums related to coverage of its participants' tobacco-related illnesses. The Fund has brought this claim in order to recover those costs. The Fund also demands injunctive relief that would require Defendants to finance tobacco-use cessation programs for the Fund's participants.

The Fund's ninety-three page complaint notwithstanding, its claim pares down to a very simple proposition: because of Defendants' fraudulent misrepresentations about and concealment of the health-related risks of using tobacco and an agreement among Defendants to forgo development of safer tobacco products, the Fund was unable to make intelligent decisions about the management of its resources and, consequently, was unable to curtail or effect the use of tobacco by its participants, resulting in vast expenditures on tobacco-related illnesses that could have been avoided if Defendants had been honest and forthright about the information they possessed. The Defendants' seventy-two page memorandum notwithstanding, their argument also pares down to a very simple proposition: whatever injury the Fund may have suffered, it is purely derivative of the physical injuries sustained by those participants who used tobacco products

---

1. It is not clear from the record whether all the named defendants were served with process. Therefore, the court refers only to those defendants who were served and are properly before the court.

and is, therefore, an indirect injury and too remote to allow recovery. Although it is important that the court be able to separate the wheat from the chaff for the purposes of narrowing and focusing on the precise issues before it, the chaff in the instant case merits explication in order that the enormity of the impact of Defendants' alleged misconduct is not unduly minimized.

According to Plaintiff, cigarette smoking is the leading cause of premature death in the United States. Each year, cigarette smoking kills more than 400,000 Americans; accounts for one of every five deaths overall; and is responsible for at least 30% of all deaths from cancer, 80% of all deaths from pulmonary diseases such as emphysema and bronchitis, and thousands of deaths from cardiovascular disease, including stroke and heart attack. In addition, smoking reduces fertility, increases the rate of miscarriages and stillbirths, and causes lower birth weights in infants. Moreover, cigarettes contain nicotine which is an addictive drug and, although it is illegal to sell cigarettes to children, virtually all smokers begin smoking before reaching maturity, often becoming addicted while they are still children. Plaintiff also alleges that the use of smokeless tobacco can cause oral cancer, cancer of the esophagus, gum disease, and dental decay.

Plaintiff describes the obstacles against which individuals, who have allegedly suffered physical injury from tobacco use, have struggled, often unsuccessfully, to hold the tobacco industry liable through initiation of products liability lawsuits. Envisioning a loss of profitability as a result of potential adverse judgments and encouraged by counsel, the tobacco companies embarked on a forty year campaign of deceit, distortion, concealment, and misrepresentation meant to undermine individual plaintiffs' ability to prove causation, a necessary element in a products liability claim. Fearing that the truth about the devastating health effects of tobacco use would cause a public outcry and conse-

quent pressure on businesses and government to restrict smoking in the workplace, the tobacco companies, their research organizations, their public relations agents, and their attorneys worked together to suppress important scientific research tending to link tobacco use with cancer. Moreover, it is alleged that the tobacco industry strenuously denied any such link and attempted to undermine the validity of any scientific information tending to support a contrary position by pointing to studies, funded by the industry itself, that tended to discredit the causal connection. In this way, the tobacco companies attempted, successfully for the most part, to maintain the illusion of an open controversy on the issue. Such artificially created controversy allowed addicted smokers to justify their continued use of tobacco even in the face of their deteriorating health and allowed the courts to dismiss the claims of those allegedly injured by tobacco use based on the speculative nature of the causal link between such use and the injuries claimed.

Plaintiff also claims that the tobacco industry specifically targeted children in order to replenish its consumer base as older smokers died each year from tobacco-related illnesses. Marketing studies aimed at discovering how best to attract children and teenagers to smoking, use of cartoons in advertising, distribution of promotional items such as t-shirts and baseball caps were all aimed at encouraging young people to smoke, while, at the same time, the tobacco companies knew that, if such tactics were successful, young people would become addicts and would eventually suffer the same dismal fate as those they were meant to replace.

In attempting to right what, if proved to be true, would be a horrific wrong on a grand scale, the Fund has brought claims against the Defendants grounded in fraud, antitrust, unfair trade practices, and assumption of a special duty. This, the Fund maintains, is not a subrogation claim. Instead, it argues that the Fund's

injuries were direct and not based on the alleged injuries to its participants. The Fund alleges that Defendants' fraudulent misrepresentations and concealment were directed at the Fund itself and were intended to facilitate the shifting of tobacco-related health care costs from the tobacco companies to health care payors like the Fund. Furthermore, the Fund alleges that Defendants manipulated the market in tobacco products in order to prevent development of safer, less addictive tobacco products, thereby making any potential preventative care initiatives by the Fund virtually impossible and causing the Fund to spend more on tobacco-related illnesses than would otherwise have been necessary.

*Fed.R.Civ.P. 12(b)(6) Standard*

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action if that action fails to state a claim upon which relief can be granted. The First Circuit Court of Appeals has recognized a tension among precedents regarding the particularity of pleading required to overcome a Rule 12(b)(6) motion and has noted that "the degree of specificity with which the operative facts must be stated in the pleadings varies depending on the case's context." *Boston & Maine Corp. v. Town of Hampton*, 987 F.2d 855, 863 (1st Cir.1993)(quoting *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992)).

■ In deciding a Rule 12(b)(6) motion, "the court must accept the well-pleaded factual averments of the . . . complaint as true, and construe these facts in the light most flattering to the [plaintiff's] cause . . . ." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988) (quoting *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.1987)). Further, "the Court must deny a motion to dismiss if the allegations of the complaint permit relief to be granted on any theory, even one not expressly stated therein." *O'Neil v. Q.L.C.R.I.*, 750 F.Supp. 551, 553 (D.R.I.1990). "Nevertheless, minimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp.*, 851 F.2d at 514.

"[A] plaintiff . . . is . . . required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Id.* at 515.

In connection with run-of-the-mine motions brought under Rule 12(b)(6), a reviewing court is obliged neither to "credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions or outright vituperation," nor to honor subjective characterizations, optimistic predictions or problematic suppositions. "[E]mpirically unverifiable" conclusions, not "logically compelled, or at least supported by the stated facts," deserve no deference.

*United States v. AVX Corp.*, 962 F.2d at 115 (citations omitted). "It is only when such conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for pleading purposes." *The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989).

■ The Court has the discretion to impose heightened specificity requirements when it is concerned about the plaintiff's ability to make out a cause of action based on the events as narrated in the complaint. *See Boston & Maine Corp. v. Town of Hampton*, 987 F.2d at 867. If despite the opportunity to fine-tune a complaint, especially at the Court's direction, " 'a naked conclusion, unanchored in any meaningful set of factual averments' is the asserted basis for relief, dismissal may follow." *Id.* (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d at 515).

*Discussion*

*RICO and Antitrust: Claims for Damages*

This court is aware of at least eleven federal district courts and three circuit courts, all presented with claims by health care trust funds against most or all of the defendants being sued in the instant case

for RICO and/or antitrust violations, that concluded that those claims should be dismissed on grounds of proximate cause and/or standing. *See, e.g., Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912 (3rd Cir.1999)(RICO and antitrust); *Laborers Local 17 Health & Benefit Fund v. Philip Morris,* 172 F.3d 223 (2nd Cir. 1999)(RICO) *withdrawn from bound volume at request of the court; Oregon Laborers Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957 (9th Cir.)(RICO and antitrust); *Laborers & Operating Eng'rs Util. Agreement Health & Welfare Trust Fund v. Philip Morris,* 42 F.Supp.2d 943 (D.Ariz. 1999)(RICO and antitrust); *Hawaii Health & Welfare Trust Fund for Operating Eng'rs v. Philip Morris, Inc.,* 52 F.Supp.2d 1196 (D.Haw.1999)(RICO and antitrust); *International Brotherhood of Teamsters Local 734 Health & Welfare Trust Fund v. Phillip Morris, Inc.,* 34 F.Supp.2d 656 (N.D.Ill.1998)(antitrust); *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.,* 24 F.Supp.2d 755 (W.D.Ky.1998)(antitrust and some RICO claims); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 7 F.Supp.2d 277 (S.D.N.Y.1998)(antitrust); *New Jersey Carpenters Health Fund v. Philip Morris, Inc.,* 17 F.Supp.2d 324 (D.N.J.1998)(antitrust); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 17 F.Supp.2d 1170 (D.Or.1998)(RICO and antitrust); *Seafarers Welfare Plan v. Philip Morris,* 27 F.Supp.2d 623 (D.Md.1998)(RICO and antitrust); *Southeast Fla. Laborers Dist. Health & Welfare Trust Fund v. Philip Morris,* 1998 WL 186878 (S.D.Fla. Apr.13, 1998)(RICO and antitrust); *Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc.,* 1998 WL 476265 (N.D.Cal. Apr.30, 1998)(RICO and antitrust); *Texas Carpenters Health Benefit Fund v. Philip Morris, Inc.,* 21 F.Supp.2d 664 (E.D.Tex.1998)(RICO and antitrust).

Only a minority of federal district courts and no circuit courts of appeal have upheld RICO and/or antitrust claims brought by health care trust funds against these defendants. *See, e.g., Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.,* 23 F.Supp.2d 771 (N.D.Ohio 1998)(denying motion to dismiss RICO and antitrust claims); *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.,* 24 F.Supp.2d 755 (W.D.Ky.1998)(denying motion to dismiss some RICO claims); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 7 F.Supp.2d 277 (S.D.N.Y.1998)(denying motion to dismiss RICO claims); *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 23 F.Supp.2d 321 (E.D.N.Y.) (1998)(denying motion to dismiss RICO claim); *New Jersey Carpenters Health Fund v. Philip Morris, Inc.,* 17 F.Supp.2d 324 (D.N.J.1998)(denying motion to dismiss certain RICO claims).

After an independent review of the issues presented, this court finds that the very practical concerns imbedded in the concepts of standing and proximate cause weigh against allowing the Fund to go forward with its claims. As the Ninth Circuit recently observed in *Oregon Laborers*, a case practically on all fours with the instant case, proximate cause is a judicial tool which "[a]t bottom ... reflects ideas of what justice demands, or of what is administratively possible and convenient." 185 F.3d at 963 (quoting *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). Although Defendants have urged a number of grounds for dismissal of Plaintiff's RICO and antitrust claims, for the following reasons this court finds the related issues of proximate cause and standing to be dispositive.

Both the Rhode Island and federal RICO statutes provide for civil recovery for any person "injured in his or her business or property by reason of" a predicate RICO offense. R.I. Gen Laws § 7–15–

4(c); 18 U.S.C. § 1964(c). Therefore, the requirements for standing under both statutes require a similar analysis. *Vitone v. Metropolitan Life Ins. Co.*, 943 F.Supp. 192, 200 (D.R.I.1996). In addition, the Rhode Island Antitrust Act, R.I. Gen. Laws § 6–36–1 through § 6–36–26, is to be "construed in harmony with judicial interpretations of comparable federal antitrust laws ...." R.I. Gen. Laws § 6–36–2(b); *see also UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp.*, 599 A.2d 1033, 1035 (R.I.1991). Therefore, the court will apply a unified analysis to the federal and state RICO claims (hereinafter "RICO") and a unified analysis to the federal and state antitrust claims (hereinafter "antitrust"), guided by federal law.

Furthermore, the requirements for standing to maintain a civil action under RICO and the antitrust laws are also similar. *Oregon Laborers*, 185 F.3d at 963 (citing *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311). RICO and antitrust law both characterize a proper plaintiff as one who has suffered an injury to "business or property by reason of" a violation of the laws' predicate substantive provisions. 18 U.S.C. § 1964(c)(RICO); 15 U.S.C. § 15(a)(antitrust). "Both also require that the alleged violation of the law be a 'proximate cause' of the injury suffered." *Oregon Laborers*, 185 F.3d at 963 (citing *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311) (RICO); *Blue Shield v. McCready*, 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)(antitrust).

Since the causes of an action or condition may be traced backward to the dawn of time and effects may reverberate forever forward, the concept of proximate causation has traditionally included the requirement that there be "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. This direct relationship has been one of the central elements necessary to establish proximate causation in RICO and antitrust claims. *Oregon Laborers*, 185 F.3d at 963 (citing *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311 (citing *As-*

*sociated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983))). Therefore, " 'a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.' " *Id.* (quoting *Holmes*, 503 U.S. at 268–69).

In support of its antitrust claim, the Fund alleges that Defendants "engaged in a decades-long conspiracy to restrain trade and inhibit competition by suppressing the development and marketing of safer, less addictive tobacco products ... and by agreeing in furtherance of this conspiracy to conceal information concerning the negative health attributes of their products. As a result of [Defendants'] conduct, competition in the market for alternative safe (or safer) tobacco products ... has been restrained, causing the Fund[ ] to incur substantial costs to treat the tobacco-related illnesses of [its] participants." Plf.'s Mem. at 30–31 (citations to the complaint omitted). Further, the Fund argues that the injury it has suffered as a result of Defendants' anti-competitive agreement was a direct injury and not derivative of the physical injuries allegedly suffered by its participants.

Similarly, in support of its RICO claim, the Fund argues that Defendants' fraud was meant to maintain the illusion of an open controversy over the causal connection between tobacco use and ill health and/or addiction and, consequently, the Fund was unable to provide a comprehensive health care program to address the subsequently recognized need to discourage and reduce tobacco use so as to decrease costs associated with tobacco-related illness. Its inability to have an impact on those costs is alleged as a direct injury to the Fund.

To determine whether an injury is too remote to allow RICO and/or antitrust standing, the United States Supreme Court has developed a three factor test

which requires the court to ask the following questions: (1) are there more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) will it be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) will the court have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. *Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311(RICO); *Associated General*, 459 U.S. at 545, 103 S.Ct. 897(antitrust).

### 1. Are There More Direct Victims Who Can Vindicate the Law?

██ The Fund argues that it has standing to assert its Rico and antitrust claims because it has suffered a direct injury to its business or property in the form of economic losses attributable to reimbursing Fund participants for medical expenses in connection with their tobacco-related diseases. Furthermore, the Fund maintains that its "economic losses are not a form of compensation for personal injuries suffered by smokers." Plf.'s Mem. at 51. Moreover, since "the Fund participants cannot and will not assert such claims," there are no more direct victims that can vindicate violation of RICO and the antitrust laws. *See* Plf.'s Mem. at 50. In essence, "[w]ithout the Fund's action, Defendants' misconduct would remain undeterred and the purposes of RICO [and the antitrust laws would be] thwarted." *Id.*

Although the Fund characterizes its injury as direct, it would have suffered no injury at all if its participants had not used tobacco and had not suffered diseases caused by tobacco use. Therefore, in order for the Fund to have been harmed by Defendants' alleged misconduct, the Funds participants must first have chosen to smoke and, subsequently, must have suffered an illness caused by smoking that they would not otherwise have contracted. It is clear that whatever injury the Fund may have suffered, it was contingent upon the actions and injury of others, which in each particular case requires its own causal connection to be established. Assuming that the Fund has in fact been injured, the most that can be said about that injury is that it is indirect. *See Oregon Laborers*, 185 F.3d at 964.

However, the Fund argues that the injured smokers cannot bring RICO or antitrust claims to recover medical expenses related to their personal injuries. While, the Fund may be right about this, *see id.*, it does not necessarily make the Fund a proper party to bring these claims. As the Ninth Circuit noted in *Oregon Laborers*, " 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.' " *Id.* (quoting *Associated General*, 459 U.S. at 534, 103 S.Ct. 897). "Some injuries caused by an antitrust [or RICO] violation may thus be left unremedied for lack of a proper plaintiff." *Id.* The court pointed out that the policy objective of limiting standing to those more directly injured is to "promote the general interest in deterring injurious conduct," *id.* at 964, thus suggesting that the focus of the direct injury requirement for RICO and antitrust standing is less on vindicating the kind of injury sustained and more on deterring the kind of misconduct that may lead to various injuries and theories of recovery.

In the instant case, Defendants' alleged misconduct may arguably constitute a RICO and/or antitrust violation. However, because of the indirectness of the Fund's injuries, it cannot be said that those violations were the proximate cause of the harm suffered by the Fund. In addition, there are injured persons, i.e., the smokers, capable and motivated to bring suit, thus "promot[ing] the general interest in deterring injurious conduct." Therefore, because there are more direct victims of Defendants' alleged misconduct who can be counted on to vindicate a direct injury caused by the alleged misconduct, this factor of the test for RICO and/or

antitrust standing weighs in favor of dismissing those claims. *See id.*

### 2. Would Damages be Difficult to Ascertain?

The Fund claims as damages monies spent to reimburse its participants for their medical care due to smoking related illnesses. The Fund alleges that its harm arose from its inability, due to Defendants' fraud and collusive anticompetitve conduct, to take initiatives aimed at reducing the incidence of smoking among its participants, which allegedly would have reduced costs associated with medical care for smoking-related illnesses. Although the fund's actual expenditures would not be difficult to ascertain, because of the many variables that might have affected those costs, it would be extremely difficult to ascertain which of those costs would or would not have been lowered. Such variables include whether individual smokers would have quit or cut down on their smoking as a result of the Fund's preventative initiatives and whether smokers would have chosen to continue with the type of cigarettes they had always smoked despite the availability of "safer" alternatives. Furthermore, the term "smoking-related illness" is only another way of saying "illness caused by smoking" and the causal link in each case would need to be established.

Nonetheless, the Fund argues that the risk that the damages will be uncertain should be born by the wrongdoer. Plf.'s Mem. at 41 (citing *Bigelow v. RKO Pictures*, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). However, in the instant case, the problem is not in calculating the actual amount spent to reimburse smokers for their medical expenses, rather the problem is in establishing to what extent smokers and potential smokers might have been affected by the initiatives that the Fund might have taken to discourage or reduce smoking among its participants. In this respect, it is not only the amount that is uncertain; the link between how

the Fund might have acted and how smokers might have reacted is highly speculative as well.

As the Third Circuit stated in analyzing the identical issue, "It is apparent why the Funds argue that they can demonstrate all of this through aggregation and statistical modeling: it would be impossible for them to do so otherwise. Yet we do not believe that aggregation and statistical modeling are sufficient to get the Funds over the hurdle of the [*Associated General*] factor focusing on whether the 'damages claim is ... highly speculative.'" *Steamfitters*, 171 F.3d at 929; *accord Oregon Laborers*, 185 F.3d at 965; This court agrees with the circuit courts of appeal that have addressed this issue and finds that the difficulty of ascertaining the damages in this case weighs in favor of dismissing the Fund's claims.

### 3. Would There be Potential for Duplicative Recovery and/or Would Complex Apportionment of Damages be Required?

In the past two years, there have been several cases filed in the United States District Court for the District of Rhode Island by individual smokers or their family members against one or more of the tobacco company defendants in this case. It is not unlikely that we will see more of these cases in years to come. The individual plaintiffs seek the same recovery as the Fund, i.e., their medical expenses, among their other claims for damages. Moreover, Rhode Island's collateral source rule prevents a plaintiff's damages from being reduced to the extent he or she has been reimbursed for medical expenses, *see Gelsomino v. Mendonca*, 723 A.2d 300, 301 (R.I.1999), thus increasing the potential for duplicative recovery should the Fund's claims be allowed to go forward. In addition, the potential for multiple recovery would intensify if indirect injury claims like the Fund's were recognized in this context. Employers might well assert an interest as distinct from that of the Fund

and might claim that, had they been properly informed of the dangers of tobacco use, they too would have instituted different policies in order to discourage smoking, which might have allowed employers to negotiate a lesser amount payable into the Fund.

It is clear that all three factors weigh in favor of finding the Fund's injury too remote to confer standing on the Fund to bring its RICO and antitrust claims for damages. Therefore, I recommend that Defendants' 12(b)(6) motion to dismiss these claims be granted.

*Antitrust and RICO: Claims for Injunctive Relief*

■ Assuming, *arguendo*, that injunctive relief is available in private civil RICO actions, *cf. Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 848 (1st Cir.1990)(assuming without deciding that relief may be available), and that all three factors of the RICO/antitrust remoteness test need not be met in order to demand injunctive relief because the calculation and apportionment of damages would no longer be an issue, the Fund must still show that its injury was proximately caused by Defendants' alleged misconduct. Both RICO and the antitrust laws have been interpreted to incorporate common law principles of causation. *See, e.g., Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 (RICO); *Associated General*, 459 U.S. at 533–34, and n. 29, 536, n. 33, 103 S.Ct. 897 (antitrust). Contingencies, conjecture, and speculation will not support a finding of proximate cause. *See, e.g., Holmes*, 503 U.S. at 271, 112 S.Ct. 1311 (applying common law interpretation of proximate cause to RICO claim and finding that "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers"); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 712, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995)(O'Connor, J., concurring)(explaining that "by the use of the word 'actually,' the regulation clearly rejects specula-

tive or conjectural effects, and thus itself invokes principles of proximate causation").

■ Here, the Fund's theory of its case is full of contingencies and necessarily invites unacceptable levels of speculation and conjecture. The court has already found that whatever injury the Fund has suffered, if indeed there was an injury, it was indirect and contingent. If not for the alleged smoking-related injuries to the smokers, the Fund would not have sustained any injury itself.

· The Fund argues, however, that because of the intentional nature of Defendants' alleged misconduct (misrepresentations directed toward the Fund and its participants and collusion to abandon efforts to develop a "safer" cigarette) and because the actions and injuries of the individual smokers was foreseeable and their addiction intended, the smokers themselves, although, perhaps, an intervening force, do not constitute a superceding cause that would break the chain of causation between Defendants' actions and the Fund's injury.

However, as discussed above in connection with the difficulty of calculating the Funds' damages, the problem with the Fund's argument is not that the amount of actual damages would be so difficult to calculate, after all the Fund can document the amount it has spent on each smoker's health care, rather the problem lies in the number of contingencies that would first have to be realized before the Fund could sustain an injury.

First, the Fund would have to show what initiatives it would or could have taken to reduce the incidence of smoking among its participants had the Defendants been honest about the health effects of smoking and had they not agreed to abandon development of a safer cigarette. Second, it would have to show whether and to what extent smokers would have responded to the Fund's initiatives and whether and to what extent their responses would

have reduced the occurrence and complexity of their illnesses and thus lowered their reimbursable health care costs. Assuming that a significant number of the Fund's participants and beneficiaries are smokers, there would necessarily be a significant amount of contingency and speculation involved in figuring out who, if anyone, might have quit smoking due to the Fund's initiatives as opposed to other influences; who, if anyone, might have reduced the number of cigarettes smoked and to what level; who, if anyone, would have smoked a "safer" cigarette; what, if any, effect the different levels of response would have had on the illnesses suffered; and what, if any, reduction in reimbursable health care costs would have been realized.

The number of possible scenarios linking the Defendants' alleged misconduct to the Funds' purported injury could only be narrowed by a significantly limited imagination as to the scope of potential influences on human action and motivation and the nature of the individual's capacity to exercise free will. Allowing the factfinder to wander freely through such a philosophical, psychological, and biological bazaar is exactly what the concept of proximate cause was meant to prevent. Therefore, because proximate cause is an essential element of the Fund's claim and because the Fund has not pled the alleged causal connection in a way that substantially removes the claim from the realm of contingency, speculation, and conjecture, I recommend that the Fund's RICO and antitrust claims for injunctive relief be dismissed.

### Rhode Island Unfair Trade Practices Act ("RIUTPA" or "Act")

■ RIUTPA makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ...." R.I. Gen. Laws § 6–13.1–2 (1992). A private cause of action under RIUTPA exists for "[a]ny *person* who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful" by the Act. R.I. Gen. Laws § 6–13.1–5.2 (1992)(emphasis added).

The Fund argues that it has standing to bring its RIUTPA claim because a "person," under the Act, includes "trusts." *See* Plf.'s Mem. at 25 (citing R.I. Gen. Laws § 6–13.1–1(3)("'Person' means natural persons, corporations, trusts ...")). However, the Fund ignores the further requirement that such person be a purchaser or lessee of "goods or services primarily for personal, family, or household purposes ...." *See* § 6–13.1–5.2.

In *Schroeder v. Lotito,* 577 F.Supp. 708 (D.R.I.1983), District Judge Selya, now Circuit Judge, was presented with a Rule 12(b)(6) motion to dismiss plaintiff's RIUTPA claim on the ground that plaintiff lacked standing. The plaintiff was a union who claimed that defendants had used a trademark similar to the union's mark in order to fool the public into thinking that defendants employed union labor in their printing business when that was not the case. Although the court found that the union had alleged an injury that was linked to the deception, it emphasized that "[t]he inescapable inference which flows from [RIUTPA's] legislative scheme is that the General Assembly intended the entitlement to sue under its Deceptive Trade Practices Act to be limited to those classes of persons designated thereunder." *Schroeder,* 577 F.Supp. at 717. Further, since RIUTPA provided a private action only to those who purchased or leased "'goods or services primarily for personal, family or household purposes,'" the court found that "plaintiffs [could not] by any stretch of the imagination tuck themselves within the citizen suit provision of § 6–13.1–5.2." *Id.; accord Scully Signal Co. v. Joyal,* 881 F.Supp. 727, 741 (D.R.I.1995)(dismissing corporate plaintiff's RIUTPA claim for lack of standing because the Act only provides private

rights of action to the Attorney General and to "person[s] who purchase or lease goods or services primarily for personal, family, or household purposes . . . ."); *ERI Max Entertainment, Inc. v. Streisand*, 690 A.2d 1351, 1354 (R.I.1997)(dismissing plaintiff video store's RIUTPA claim for lack of standing because plaintiff was clearly not a person who's injury stemmed from the purchase or lease of "goods or services primarily for personal, family, or household purposes").

The Fund has not alleged, nor do the facts suggest, that it was a purchaser or lessee of any of Defendants' goods or services that were intended to be used primarily for personal, family, or household purposes. Therefore, the Fund lacks standing to bring its RIUTPA claim and I recommend that the claim be dismissed.

*Fraud*

■ To prevail on a fraudulent misrepresentation claim in Rhode Island, plaintiff must be able to prove, *inter alia*, that he relied on defendant's misrepresentation and that such reliance was the proximate cause of his injury. *See, e.g., Ralston Dry–Wall Co., Inc. v. United States Gypsum*, 926 F.2d 99, 102 (1st Cir.1991)(applying Rhode Island law). As discussed above in connection with the Fund's RICO claim based on fraud, the Fund will not be able to meet its burden as to the necessary showing of proximate cause.

The Fund alleges that Defendants' intentional false statements about the health effects of tobacco use were directed at both smokers and at "payors of tobacco-related health care costs, including the Fund[ ]." Plf.'s Mem. at 54. Defendants' false statements were intended to deceive smokers and the Fund and "to divert liability for paying substantial sums to treat . . . tobacco-related illnesses onto the Fund[ ] and other health care payors." *Id.* In addition, because the Fund justifiably relied on those statements, it was prevented from discouraging and reducing tobacco use by its participants, which resulted in higher medical costs to the Fund than

otherwise would have been incurred. Further, the Fund maintains, because Defendants' conduct was intentional and morally blameworthy, the remoteness of the Fund's injury is not dispositive of the proximate cause analysis. Moreover, the Fund argues, the Fund's increased costs for health care was intended, foreseeable, and substantially likely to occur as a result of Defendants' acts. Finally, in these circumstances, the Fund urges the court to equate substantial cause with proximate cause.

Assuming, *arguendo*, that Defendants' alleged misrepresentations were intended to preclude the Fund from implementing initiatives to reduce or eliminate smoking among its participants and to shift medical care costs from the tobacco companies to the Funds and even assuming that such consequences were foreseeable and such conduct is morally blameworthy, the Fund cannot escape the fact that there exist innumerable contingencies through which a factfinder would have to sort in order find that the Fund's purported injury was substantially likely to result from Defendants' conduct. Therefore, even accepting a formula that equates substantial cause with proximate cause, as discussed above in connection with the Fund's RICO and antitrust claims, the gap between Defendants' conduct and the Fund's purported injury can only be filled with contingency, speculation, and conjecture. The path chosen in an attempt to bridge that gap would inevitably be arbitrary. Accordingly, I recommend that the Fund's fraud claim be dismissed.

*Failure to Perform a Special Duty*

As the Third Circuit noted in *Steamfitters*, a special duty claim is essentially a negligence claim and, therefore, requires proof of the underlying elements of a negligence claim, including proximate cause. 171 F.3d at 936. For the reasons discussed at length above, the Fund will be unable to prove this element of its claim

and, therefore I recommend that the Fund's special duty claim be dismissed.

### Conclusion

For the reasons stated, I recommend that Defendants' Rule 12(b)(6) motion to dismiss be granted as to all of the Fund's claims. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Fed. R.Civ.P. 72(b); Local Rule 32. Failure to file timely, specific objections to the report constitutes waiver of both the right to review by the district court and the right to appeal the district court's decision. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

Aug. 11, 1999.